IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GEORGE SCOTT MARSHALL,          )
                    Plaintiff          )
                                    )
     vs.          )          Civil Action No. 08-90
                                      )          Chief Magistrate Judge Amy Reynolds Hay
PENN TOWNSHIP, PENNSYLVANIA,          )
a political subdivision; CHIEF MICHAEL          )
MASTROIANNA, an individual;          )
LIEUTENANT RALPH BOURA, an          )
individual; OFFICER WILLIAM T.          )
SUPANCIC, an individual; OFFICER          )
WILLIAM G. SUPANCIC, an individual          )
and DETECTIVE SERGEANT          )
ANTHONY PECORA, an individual,          )
                    Defendants          )

## MEMORANDUM OPINION

       This is a civil rights action brought pursuant to 42 U.S.C. § 1983 by George Marshall

("Marshall" or "the Plaintiff"), a resident of Greensburg, Pennsylvania.  Marshall alleges that his

constitutional rights were violated by actions of Penn Township, its Chief of Police, and its

police officers, when officers were dispatched to his home after his girlfriend called 911 to report

that Marshall was ill.  In Count I of the five count [1] Complaint, Marshall alleges that Penn

Township violated his Fourteenth Amendment substantive due process rights by "failing to

properly train and supervise the Defendant police officers them [sic] with regard to appropriate

interaction with the public without causing the deprivation of constitutional rights." (Doc. 1 ¶

67).  Specifically, Marshall alleges that the Township failed to train its officers in the proper use

---

     [1] The counts are misnumbered. Although the last count in the Complaint is numbered "VI," there
is no Count V.  In order to avoid further confusion, the Court refers to the Counts by the numerals used in
the Complaint.

of force, and in the duty to provide medical treatment.  In Count II of the Complaint Marshall alleges that Penn Township's Chief of Police, Michael Mastroianna [2] ("Mastroianna"), inadequately supervised or monitored subordinate officers. The Plaintiff also alleges that Mastroianna  promulgated and implemented, or failed to promulgate and implement policies regarding the appropriate use of force and providing reasonable medical treatment.  Count III names Penn Township Police Lieutenant Ralph Boura ("Boura"), Detective Sergeant Anthony Pecora ("Pecora"), and Officer William T. Supancic ("W.T. Supancic"), claiming that they willfully and wantonly used excessive force in violation of the Fourth and Fourteenth Amendments in subduing and arresting Marshall. [3] At Count IV,  Marshall claims that W.T. Supancic, and William G. Supancic ("W.G. Supancic") violated the Fourth and Fourteenth Amendments when they signed refusal of treatment forms on behalf of Marshall at a time when he was not capable of refusing treatment.  Count VI sets out a state law claim alleging vicarious liability on the part of Penn Township for assault and battery committed by the individual Defendants, with the exception of W.G. Supancic.  Cross Motions for Summary Judgment are pending.  The Court will deny the Motion filed by the Plaintiff (Doc. 26).  The Motion filed by the Defendants (Doc. 22) will be granted in part and denied in part.

I.    **Standard of Review**

A party seeking summary judgment must demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The non-moving party must

---

[2]The spelling of the Police Chief's name varies in the Complaint.  The Court adopts the spelling used in the case caption.

[3]Marshall has abandoned his substantive due process claim as to the use of force, recognizing that this claim must be analyzed under the Fourth Amendment.  (Doc. 31 at unnumbered page 6).

respond by presenting evidence that a genuine issue of material fact compels a trial.  (Id. at 324).

In doing so, the non-moving party must point to specific facts rather than to "some metaphysical

doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.

574, 586-87 (1986).  This means that the non-moving party cannot defeat summary judgment by

relying on unsupported assertions, bare allegations, or speculation.  See Ridgewood Bd. of Educ.

v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir.1999).  The mere existence of some evidence

favoring the non-moving party will not defeat the motion.  There must be enough evidence with

respect to a particular issue to enable a reasonable jury to find in favor of the non-moving party.

Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  In evaluating the evidence, the Court

must consider all facts and their reasonable inferences in the light most favorable to the

non-moving party.  See Pennsylvania Coal Ass'n v. Babbitt, 63 F. 3d 231, 236 (3d Cir.1995).

The Court may not assess credibility or the weight of the evidence; it may determine only the

existence of a triable issue of fact.  Big Apple BMW of N. Am. Inc., 974 F.2d 1358, 1362 (3d

Cir.1992).  A motion for summary judgment will be granted where the materials in the record, if

reduced to admissible evidence, would be insufficient to satisfy the non-moving party's burden of

proof at trial.  Celotex,  477 U.S. at 322.

## II.    **Background** [4]

Marshall alleges that during the week prior to Christmas 2004, he engaged in a period of

heavy drinking that was related to the death of his son in a motor vehicle accident some two

years earlier.  In mid-January 2005, Bonita McKowen ("McKowen"), took Marshall to the

emergency room at Jeannette Hospital because he was weak, not eating, drinking heavily, and

---

[4]Where the facts are disputed, the Court so notes.

abusing prescription sleep medication.  (Doc. 26 ¶ 2).  Marshall was released, but the problematic symptoms and behavior persisted.

On January 22, 2005, McKowen became particularly concerned because Marshall was weak, did not feel well, had consumed nineteen beers, and could not sleep.  He had taken antidepressants and sleeping pills in amounts greater than were prescribed. ( Id. at ¶¶ 4-7, 160)).  Late that afternoon,  McKowen called 911 to have Marshall taken to the hospital after he had collapsed three times while to trying to stand and walk.  (Id. at ¶ 65).  McKowen testified at her deposition that after she placed the call, Marshall said, "I don't want an ambulance, I don't want an ambulance."  (Doc. 24 Ex. F at 22).  While she was on the phone with the 911 operator, Marshall crawled to her, pulled himself up, and took the phone out of her hand, telling the dispatcher, "I don't want no ambulance," and hanging up the phone.  (Id.)  Marshall fell, and when 911 called his home, he reiterated that he did not want an ambulance and again terminated the call.  (Id. at 23).  McKowen testified: "I don't know how many times he hung up on 911, I have no idea, but he kept hanging up on them.  I would say two or three times, maybe.  I know it was at least twice."  (Id.)  At the end of these calls, Marshall again stated that he did not want an ambulance, and crawled back to his bedroom.  (Id. at 24).

A transcript of the testimony of W.T. Supanic, attached as an exhibit to Marshall's Motion for Summary Judgment, shows that in the late afternoon of January 22, 2005, he, Boura, and Pecora were dispatched to Marshall's residence.  (Doc. 29 Ex. H. at 5).  The 911 dispatcher reported that the call for an ambulance "sounded like a physical domestic between the two parties," and the dispatch was "for a domestic."  (Id. at 6).  The police were also dispatched by the ambulance service.  The service said that the medical unit would not enter Marshall's residence until police arrived and cleared the scene.  (Doc. 25 Ex. B at 44).  Boura testified at

trial that the dispatcher told the officers that they had lost voice contact with the caller, heard screaming in the background and that the phone went dead.  (Doc. 24 Ex. B at 43).  Officers reported to Marshall's in three separate cars.  (Id. at 45).  Two ambulances responded to what they were told was a  possible domestic violence situation.

When officers drove up the road on which Marshall lived, they observed McKowen waving to them.  (Id. at 45-46).  She explained that she was concerned for Marshall's safety, stating that he had not hurt her.  (Id. at 47).  Bora testified that the officers asked McKowen whether Marshall had weapons in his home, and that McKowen responded that he kept weapons in the bedroom.  (Id. at 47).  W.T. Supanic testified that McKowen told the officers that Marshall kept a gun in his bedroom.  (Doc 29 Ex. H at 7).  McKowen confirmed the following exchange: "[A]nd they said does he have any weapons, I'm like well, yeah, you know."  (Doc. 33 Ex. G. at 162.).  She stated that she told the officers that Marshall kept an army knife, a gun in his closet, and a BB gun behind the couch, but that she did so only after Marshall was in police custody.  McKowen testified that she had not told police that there were weapons in Marshall's nightstand, or "that there were weapons in the bedroom specifically."  (Id.).  McKowen had last seen Marshall crawling toward his bedroom.  ( Id.).

In his Concise Statement of Facts (Doc. 27) and his deposition testimony (Doc. 33), Marshall sets out his version of what transpired next.  W.T. Supanic entered Marshall's bedroom and saw Marshall, who appeared to be intoxicated and unable to stand.  Marshall was lying on his left side between his bed with his face to the wall and his head near a nightstand.  (Doc. 33 Ex. C at 54).  There was no light on in the bedroom.  The other officers entered the room and told Marshall "that Ms. McKowen had advised them that he needed an ambulance."  (Doc. 27 at ¶ 44).  Marshall "replied that the did not need any fucking ambulance and told them to get out."

(Id. at ¶ 45).  The officers told Marshall to get up because they wanted to talk to him.  Marshall

states that they were "nudging" his feet.  (Id. at ¶¶ 18-23, Doc. 33 Ex. C at 55).  McKowen stated

that she heard Pecora tell Marshall that the officers just wanted to talk to him, and heard Marshall

answer, "I'm not doing nothing, I'm just trying to get in bed."  (Doc. 27 at ¶ 69).  "[I]n a matter

of seconds," she says that she heard Pecora saying, "Get him, get him, get him," and "Haven't

you had enough yet, you motherfucker."  (Id.).

       According to an incident report prepared by W.T. Supanic, officers entering Marshall's

bedroom were unable to see his hands, and ordered him several times to put them in the air.

(Doc 24 Ex C at 3).  Marshall lifted his right hand toward the bed, and the officers ordered him to

stop.  (Id.).  W.T. Supanic states that he saw Marshall reach for the handle of the nightstand.  (Id.

at ¶ 21).  Again, the officers told Marshall to stop, and he failed to comply.  Marshall disputes

that he reached for the nightstand and that he failed to comply with the officers' orders.

       Pecora states that he grabbed for Marshall's arms, and Marshall resisted.  (Doc. 24 Ex. C

at 3).  When Marshall tried to get up by placing one hand on the bed, he was tased by Supanic,

but one of the probes failed to make contact.  Marshall contends that both of the Taser probes

deployed, and that it functioned fully.  He insists that after he was tased he ceased resisting, but

was tased a second time.  According to the officers, Marshall was tased again because he

continued to resist.  According to W.T. Supanic, at the time of the second tasing, the taser had

lost conductivity.  (Id. at ¶¶ 23-24).

       Marshall states that he remembers feeling the impact from the taser barbs twice.  The first

impact was on the left side of his abdomen, but he was not sure whether both barbs hit him.  He

believes that the second taser hit him in the front of the abdomen.  (Doc. 33 Ex. C at 57).  The

three officers removed Marshall from his bedroom, and attempted to cuff him in the hallway.

They were unsuccessful because Marshall was kicking at them.  (Doc. 24 Ex. C at 3).  They then moved the Plaintiff to the living room where Marshall admits that he "started to push and kick," that "officer Supanic was struggling with him," and that "the officers had to use the taser one more time."  (Doc. 27 at ¶¶ 27-28).  The officers then carried Marshall outside.  "Mr. Pecora had him under the shoulders and the other two policemen were carrying him by his legs."  ( Doc. 33 Ex. G at 165).  According to the officers, when they again tried to cuff Marshall, he resisted, and Boura used the taser "in drive stun mode [5] several times to overcome [Marshall's] resistance." (Doc. 24 Ex. C at 3).  "The officers then got Mr. Marshall's hands behind his back and handcuffed him."  (Doc. 27 at ¶ 29).  McKowen stated that "[h]is shirt was wrapped around his neck, his pants were down, his whole bum was hanging out."  (Doc. 33 Ex. G at 166).  Marshall contends that he was tased again in his upper chest after he was handcuffed.  (Doc. 33 Ex. C at 64).  He was then taken to an ambulance by two officers who were holding him under his arms. After Marshall was taken from the house, one of them found a twelve inch bayonet knife in the drawer of the nightstand in Marshall's room and an SK Russian rifle in his closet. (Doc. 29 Ex. H at 10).

The officers' account of Marshall's medical evaluation by the ambulance is summarized by W.T. Supanic in the incident report as follows:

> On scene, [Marshall] was assessed by the Penn Township Ambulance Association.  The Taser probes were removed and [Marshall] did not require any medical treatment. [He] was taken to the rear of the ambulance and placed onto the cot.  Paramedic Andres [sic] performed a detailed assessment . . . and determined [that Marshall] was not in need of emergency treatment. [He] was

---

[5] W.T. Supanic testified that once a Taser cartridge has been deployed, it no longer produced a neuromuscular effect; the device can be used only in drive stun mode to inflict pain.  (Doc. 33 Ex. G. at 65).

already handcuffed behind his back and strapped into the cot.

(Doc. 24 Ex. C at 3).  The ambulance incident report prepared by Michael Andras ("Andras")

states that Marshall suffered a superficial injury from a taser electrode that was removed from his

abdomen at police request.  (Doc. 24 Ex. C at 2).  The assessment "reveal[ed intoxication, but no

indicators of a medical emergency or trauma."  ( Id.).  Andras stated that "[p]olice officer refused

further treatment via signing of [the] refusal form."  (Id.).  At his deposition, Andras testified that

he recommended to Marshall that he go to the hospital, and that Marshall refused.  (Doc. 24 Ex.

H at 36).  Andras told Boura that Marshall was refusing transport to the hospital.  Id.  Another

member of the ambulance crew, EMT Jonathan Lindsey ("Lindsey"), stated at his deposition that

W.T. Supanic signed Marshall's refusal of treatment form "because the patient was in his

custody and the patient was denying transport to the hospital."  (Id. Ex. I at 14).  Lindsey knew

that Marshall was denying transport because Lindsey asked Marshall numerous times if he

wanted to go, and Marshall responded that he did not.  (Id. at 16).  Lindsey did not believe that

Marshall needed to go to the hospital, stating that if Marshall had needed to go, the ambulance

crew would have persuaded him to do so.  (Id. at 16).  "For [Marshall's] safety, [he] was

transported to the Penn Township Police Department for processing" on charges of disorderly

conduct and resisting arrest.  (Doc. 24 Ex. C at 3).  Marshall acknowledges that he could not sign

the Refusal of Treatment form because he was intoxicated.

At the Police Department, Marshall appeared to be highly intoxicated.  He needed

assistance walking, smelled of alcohol, and was glassy eyed.  (Id. Ex. B. at 109).  W.G. Supanic

testified that Marshall was placed in a cell where he sat on a cot as he was told to do.  (Id. at

110).  The cell was under video surveillance, and an officer was required to visit the cell

periodically.  (Id.).  When Boura checked the monitor, he saw that Marshall was lying on the cell

8

floor.  (Id.).  Later, W.T. Supanic observed that Marshall had fallen from the cot a second time, and had suffered a laceration above his eye.  The ambulance service was called.  (Id. at 113-114).  Paramedic Andras testified that he cleaned and bandaged Marshall's eye, and that Marshall still appeared to be intoxicated.  (Id. Ex. H at 44).  W.G. Supanic executed a second patient refusal form, indicating that Marshall did not wish to be taken to the hospital.  (Id.).

Marshall was arraigned via video on charges of resisting arrest and disorderly conduct.  (Doc. 24 Ex. E at 8).  When he could not make bail, he was secured in a police vehicle and transported to the Westmoreland County Jail.  "[B]ecause of his intoxication and laceration over his eye the jail nurse wanted Marshall taken to the Westmoreland County Hospital."  (Id.).  W.G. Supanic transported Marshall to the emergency room where he was cuffed to a gurney and, later, to a bed.

Hospital records show that Marshall had been drinking, had fallen several times, and had been engaged in domestic abuse over the prior three days.  He reported that he had been assaulted by police earlier in the evening.  Diffuse bruising was noted, as were lacerations on his head and left elbow.  He reported that he had fallen in his cell, was dizzy and lightheaded, and had a headache.  X-rays of his shoulder, neck, and arm, and CT scans of his pelvis and brain were negative. His head wound was closed with four stitches.  For alcohol-related reasons, he was not medically stable, and was admitted to the hospital so that his liver function and alcohol withdrawal could be monitored.  (Doc. 24 Ex. C).  Marshall was placed under guard until he was able to make bail, some thirty-six hours after his hospitalization.  He remained in the hospital for two weeks, and was transferred to Baldock Health Care Center where he was treated for an additional four days.

The disorderly conduct charge against Marshall was dismissed at a preliminary hearing

on March 7, 2006.  (Doc.1 ¶ 59).  Following a jury trial held in the Court of Common Pleas of

Westmoreland County, Pennsylvania on July 5 and 6, 2007, Marshall was acquitted on the

charge of resisting arrest.  (Id. at¶ 60, Doc. 24 Ex. B. at 224).

**III.**     **Discussion**

In order to survive a motion for summary judgment on a section 1983 claim, a plaintiff

must show that the defendant acted under color of state law, and that the plaintiff was deprived of

a federal constitutional right.  Because there is no dispute that these Defendants were state actors,

the focus of the Court's analysis is whether any Defendant transgressed Marshall's constitutional

rights.  Thus, in order for Marshall's section 1983 claim to survive a motion for summary

judgment, the Court must find a genuine issue of material fact as to this issue.

Marshall's Complaint is less than clear, setting out generalized allegations without

consistently identifying those portions of the Constitution which he contends were violated.  The

brief in support of the Motion (Doc.28)  does little to remedy this shortcoming, as it fails

altogether to address a number of the claims, and discusses others not made in the Complaint.

The Court has broadly construed the Plaintiff's claims, addressing all discernible bases for

Marshall's constitutional arguments.

**A.  Claims Made Against Penn Township**

Municipalities, are "persons" for purposes of section 1983, and may be liable for

constitutional torts when: (1) the plaintiff's harm was caused by a constitutional deprivation; and

(2) the municipal entity is responsible for that violation.  Collins v. City of Harker Heights, 503

U.S. 115, 120 (1992).  A municipality may not be held vicariously liable for the constitutional

10

violations of its agents under a theory of respondeat superior.[6]  Id. at 122.  Rather, liability

attaches "when execution of a government's policy or custom, whether made by its lawmakers or

by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that

the government as an entity is responsible for under § 1983."  Monell v. Dept. of Soc. Serv., 436

U.S. 658, 694 (1978).

### 1.  Failure to Train

 Marshall alleges that Penn Township violated his constitutional rights when it failed to

train and supervise its police officers "with regard to appropriate interaction with the public

without causing the deprivation of constitutional rights," and "with regard to the duty to provide

reasonable medical treatment."  (Doc. 1 ¶¶ 66, 68).

In City of Canton v. Harris, 489 U.S. 378, 385 (1989),  the Supreme Court held that in

order to support liability, the need for better training must be so obvious, "and the inadequacy so

likely to result in the violation of constitutional rights, that the policymakers of the city can

reasonably be said to have been deliberately indifferent to the need."  Id. at 390. The municipality

will be liable under § 1983 only when its failure to act "reflects a 'deliberate' or 'conscious'

choice."  Id. at 389.   A showing of simple or even heightened negligence is not enough.  Berg v.

---

 [6]To the extent that Marshall seeks to hold the Township liable based solely on the fact that the
individual Defendants were its agents, servants, or employees, (see Doc. 1 ¶¶ 65, 67, 73), the Township is
entitled to summary judgment.  The Township is also entitled to summary judgment on the state law
assault and battery claims.  Marshall alleges that the Township is vicariously liable for the actions of
Mastroianna, Boura, W.T. Supanic, and W.G. Supanic because it,"through its employees . . .
intentionally caused bodily harm to Plaintiff by causing him to be shot, repeatedly, with numerous
tasers."  (Doc. 1 ¶ 2).  Courts addressing the Pennsylvania Tort Claims Act , 42 Pa. Cons. Stat. Ann. §
8541- 8564, have concluded that the Act "does not include law enforcement activity as an activity on
which a plaintiff may found municipal liability," and "have consistently held that one may not make a
claim against a municipal corporation for an intentional tort."  Talley v. Troutman, Civ. A. No. 96-5190,
1997 WL 135705, at *6 (E.D. Pa.  March 13, 1997) (collecting cases).

County of Allegheny, 219 F.3d 261, 276 (3d. Cir. 2000).  Similarly, it is not enough to show that municipal officers could have been better trained or that additional training could have reduced the overall risk of constitutional injury.  See Canty v. City of Philadelphia, 99 F. Supp.2d  576, 581 (E.D. Pa. 2000) (citing Colburn v. Upper Darby Twp., 946 F.2d at 1029-1030 (3d Cir. 1991)).

A plaintiff alleging failure to train is also required to "demonstrate  a 'plausible nexus' or 'affirmative link' between the municipality's [failure to train] and the specific deprivation of constitutional rights at issue."  Bielvicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). "'[T]he identified deficiency in the training program must be closely related to the ultimate constitutional injury,' and the plaintiff must 'prove that the deficiency in training actually caused the constitutional violation, i.e., the police custodian's indifference to her medical needs.'" Blakeslee v. Clinton County, No. 08-1343, 2009 WL 2023554, at *2  (3d Cir. July 14, 2009) (internal citations omitted)..

### a.  Use of Force

The sole use of force to which Marshall refers in the Complaint and the materials supporting of his Motion for Summary Judgment relates to use of a Taser®. [7]  Marshall contends that he was deprived of his Fourth Amendment rights when the Taser was used repeatedly in a "manner that was disproportionate to the force necessary to engage [him] in conversation, and in a situation where [he] was not yet placed under arrest, and where there was no reason for [him] to be placed under arrest."  (Doc. 1 ¶ 83).  Even assuming, for purposes of the failure to train claim, that Marshall has established a violation of the Fourth Amendment, this claim fails.

_____

[7]The Court recognizes that this is a proprietary term, but does not use the symbol so indicating in the remainder of the opinion.

Mastroianna, who is identified as the municipal policymaker for purposes of this claim, testified that he made the decision to equip Penn Township officers with Tasers in order to reduce the number of injuries suffered by officers during the course of duty.  (Doc. 33 Ex F at 73).[8]  He also testified that each of the officers involved in the incident at Marshall's home had been trained and certified in use of the device.  (Doc. 24 Ex. A at 66).  This training and certification took place yearly, and officers who did not complete training were not permitted to carry Tasers. (Id.).

According to Mastroianna, training given to Penn Township officers was not limited to Taser use.  He stated that in July 2005, the Department became "the first police agency in Westmoreland County to be accredited by," and is now one of only six agencies west of Harrisburg to have received accreditation from the Pennsylvania Law Enforcement Accreditation Commission. (Id. at 94-95 ). Mastroianni serves as an "accreditation assessor, team leader, as well as an instructor for the accreditation program in Pennsylvania." (Id. at 95).  The Commission, operated through the Pennsylvania Chiefs of Police Association, requires that police departments seeking accreditation meet 124 law enforcement standards.  (Id.).  In compliance with accreditation requirements, the Department had a use of force policy that was reviewed with officers at least yearly.  (Id. at 93).

Marshall's only "evidence" relating to the alleged failure to train consists of conclusory statements in his Complaint.  He does not address Mastroianna's testimony regarding officer training, and does not identify any inadequacy or gap in the training provided with respect to use of the Taser or the use of force in general.  He does not identify one other person to have alleged

---

[8]The Plaintiff's characterization of Mastroianna's interest in officer safety as motivated by a desire to avoid paying workers' compensation claims is not justified by any portion of the record.

that he suffered constitutional injury due to use of force by a police officer in Penn Township.

The deficiencies in Marshall's claim for failure to train also doom his claim that acquiescence to misuse of force constituted an actionable custom.  A plaintiff seeking to establish section 1983 municipal liability based on a custom bears a substantial burden.  A single incident involving challenged conduct does not constitute a custom.  See Groman v. Twp. of Manalapan, 47 F.3d 628, 637 (3d Cir.1995) (holding that vague allegations coupled with one incident of allegedly illegal behavior do not establish a custom).  Proof of causation is also critical.  The Supreme Court stated in Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397 (1997):

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Id. at 404 (emphasis in original).

Marshall has failed to adduce any evidence showing - or even suggesting -  that the Township had a custom of ignoring or acquiescing in its police officers' alleged use of excessive force.  It follows that he has also failed to show causation.  As a result, Penn Township is entitled to summary judgment as to claims alleging failure to train in the proper use of force and the existence of a custom evidencing acquiescence in the use of excessive force.

**b. Failure to Provide Reasonable Medical Care**

According to Marshall, Penn Township is also liable for "violat[ing his] Fourteenth Amendment substantive due process rights by failing to properly train and supervise the

Defendant police officers with regard to the duty to provide reasonable medical treatment."
(Doc 1 ¶ 69). [9]  Specifically, Marshall objects to the fact that W.T. Supanic and W.G. Supanic,
acting without Marshall's consent,  signed a form provided by the ambulance service indicating
that Marshall elected to waive further medical treatment.  Marshall has not demonstrated that any
policy, custom, or lack of supervision with respect to medical treatment caused any of his alleged
injuries. [10]  Instead, the record shows that Penn Township police officers ensured that Marshall
did receive appropriate medical treatment.  He was evaluated by paramedics both at his residence
and at the Penn Township Police Department.  Medical personnel promptly attended to the
superficial wound caused by one taser probe, and treated the "minor" laceration above Marshall's
eye.  (Doc. 24 Ex. C at 2; Ex. H at 44).  The evidence also shows that medical responders did not
believe that Marshall needed additional treatment.  (Id. Ex. I at 14,16; Ex. C). [11]  The record also
shows that as soon as the nurse at the Westmoreland County Jail notified officers that Marshall

---

[9] In his Brief in Support of Motion for Summary Judgment, Marshall asserts, for the first time, a
claim under the Eighth Amendment for denial of medical care.  The Eighth Amendment has no application
to the facts of this case.  It "was designed to protect those convicted of crimes and consequently . . . applies
only after the State has complied with constitutional guarantees traditionally associated with criminal
prosecutions."  Whitley v. Albers, 475 U.S. 312, 318(1986) (citation and internal quotations omitted).
Moreover, the Court will not analyze claims made for the first time in a brief.  It is well established that a
plaintiff may not attempt to amend his complaint through his brief.  See Commonwealth of Pa. ex. rel.
Zimmerman v. Pepsico, Inc., 836 F.2d 173, 181 (3d Cir.1988).

[10] He has also failed to show that there had ever before been another case where a person in the
custody of Penn Township police alleged or documented injury due to the lack of medical care, inadequate
treatment, or a delay in treatment.  "[I]n the absence of any unconstitutional statute or rule, it is plaintiffs'
burden to articulate a factual basis that demonstrates considerably more proof than a single incident."  House
v. New Castle County, 824 F. Supp. 477, 486 (D.Del.1993) (citing City of Oklahoma City v. Tuttle, 471 U.S.
808, 823-24 (1985)).

[11] In an ambulance incident report describing treatment administered outside of Marshall's
residence, Paramedic Andras wrote that there were "no indicators of a medical emergency or trauma."
When the same paramedic examined Marshall at the Police Department, he described the cut on Marshall's
forehead as "minor" and wrote that Marshall had no other complaints.  (Doc. 24 Ex. C).

required medical attention before he could be housed there, Marshall was transported to a hospital where he received additional care.  Hospital records show that Marshall's admission and subsequent stay had nothing to do with injury or trauma, but were related instead to alcohol abuse and the attendant symptoms of withdrawal.

Marshall has not produced a single piece of evidence demonstrating that any of his injuries were caused by the existence, absence, or inadequacy of police training, or the existence of a custom relating to the delivery of medical care.  As to these claims, too, Penn Township is entitled to summary judgment.

### B.  Claims Made Against  Mastroianna

The only claim made against Mastroianna himself is based on his role as a supervisor  In order to survive a motion for summary judgment on such a claim, a plaintiff must point to evidence in the record which establishes that: (1) an existing policy or custom created an unreasonable risk of constitutional injury; (2) the supervisor was aware of and deliberately indifferent to this unreasonable risk; and (3) injury resulted from the policy or practice.  Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir.1989).  "[The plaintiff] must identify specific acts or omissions of the supervisor that evidence deliberate indifference and establish a link between the act or omission and the ultimate injury."  Diaz v. Carroll, 570 F. Supp.2d 571, 577 (D. Del. 2008) (quoting Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001)).

The Plaintiff has not met his burden of proof as to any of these elements.  Mastroianna, too, is entitled to summary judgment.

### C.  The Medical Treatment Claim Against William G. Supanic

The single basis for the claim against this Defendant is his execution of a Patient Refusal Information Sheet, "purportedly on [Marshall's] behalf," after paramedics washed and bandaged

the Plaintiff's forehead at the Police Department.  Marshall contends that by signing this form,

W.G.  Supanic violated his "Eighth Amendment right to medical care, and his Fourth

Amendment due process right."  (Doc. 28 at ¶ 2).

First, the Fourth Amendment does not contain a due process clause or confer due process

rights.  Second, the Eighth Amendment applies only after the point of conviction.  See

Montgomery v. Ray, No. 4248, 2005 WL 1995084, at *1 (3d Cir. Aug. 19, 2005) ( proper

standard for examining claims made by detainee after arrest but prior to conviction is derived

from the Fourteenth Amendment -  whether delay of medical care constituted punishment prior

to adjudication of guilt) (citing Bell v. Wolfish, 441 U.S. 520 (1979)).

In Hubbard v. Taylor, 399 F.3d 150 (3d Cir. 2005), the Court of Appeals for the Third

Circuit clarified that the Eighth Amendment standard acts as a floor for due process inquiries into

medical claims made by pretrial detainees.  Id. at 165-67.  These detainees retain at least those

constitutional rights enjoyed by convicted prisoners with respect to the conditions of

confinement.  Bell 441 U.S. at 545 (1979).  Neither the Court of Appeals for the Third Circuit

nor the Supreme Court has drawn the precise contours of the standard applicable to a pretrial

detainee's Fourteenth Amendment claims relating to medical care.  See Wood v. City of

Lancaster, No. 06-3033, 2009 WL 80306, at *15 (E.D. Pa. Jan.13, 2009).  To date, the Court of

Appeals has applied the Eighth Amendment standard to these claims.  See Natale v. Camden

County Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003) (citing Boring v. Kozakiewicz, 833 F.2d

468, 472 (3d Cir. 1987)).[12]

---

[12]Although the Court recognizes that at least one District Court within the Third Circuit has
articulated and applied a less rigid standard to claims made by pretrial detainees under the Fourteenth
Amendment than that applicable to claims made pursuant to the Eighth Amendment, see e.g., Hojnowski v.
Primecare Med., No. 06-CV-1228, 2009 WL 1175611, at *4 (E.D. Pa. April 30, 2009) (applying reckless

Under that standard, a claim based on delay of medical care has two prongs, each with a rigorous standard of proof.  Marshall must establish first that he suffered from a serious medical condition, such that failure to secure immediate treatment could have been expected to lead to "substantial and unnecessary suffering, injury, or death."  Woloszyn v. County of Lawrence, 396 F.3d 314, 320 (3d Cir. 2005) (citing Colburn, 946 F.2d at 1023).  A minor head laceration, even coupled with intoxication, hardly qualifies.  This is especially true where Marshall had already been evaluated by trained paramedics and EMT's who did not believe that he needed additional treatment.  Furthermore,  even if the Court were to assume that Marshall's injury satisfied the first criterion, the record will not support a finding that W. G. Supanic, in signing the refusal form, acted with deliberate indifference - the second prong of a viable Fourteenth Amendment claim.

The test for accessing deliberate indifference is subjective, requiring a plaintiff to show that the defendant had *actual knowledge of a serious health risk*, and consciously disregarded that risk so as to inflict punishment.  Johnson v. Doughty, 433 F.3d 1001, 1010 (7th Cir.2006) (citing Farmer, 511 U.S. at 837-38) (emphasis added).  It is what the officer *knew*, not what he should have known, that is dispositive.  Marshall misapprehends the deliberate indifference requirement and the evidence necessary to support it.  He argues that the standard has been met as to his claim against Supanic because "the Penn Township Police Department has no policy with respect to whether or not police officers can execute Patient Refusal Information Sheets on behalf of an individual they have detained."  (Doc. 28 at unnumbered page 8).  This statement says nothing about Defendant Supanic, although it is *his* subjective state of mind that is at issue.

_____

indifference rather than deliberate indifference standard); Wood,  2009 WL 80306, at *15-16 (same), the Court does not address an alternate standard because the Plaintiff failed to raise this issue.

There is no evidence at all to suggest that W.G. Supanic was subjectively aware of any serious health risk faced by Marshall.

In the interest of complete analysis, the Court notes that there is yet another obstacle to Marshall's claim against W.G. Supanic. Where, as here, the Fourteenth Amendment claim is based on delay in providing medical treatment, the delay does not rise to the level of a constitutional violation unless it results in substantial harm.  See Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir.1993) (emphasis added).  See also  Laughin v. Schriro, 430 F.3d 927, 929 (8th Cir.2005) (claim based on delay of medical treatment cannot succeed absent medical evidence showing detrimental impact of delay); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.1985) (same).  The Court of Appeals for the Third Circuit recognized this principle in Brooks v. Kyler, 204 F.3d 102, 105 n.4 (3d Cir. 2000) (Fourteenth Amendment claim failed where prisoner-plaintiff "presented no evidence of any harm resulting from a delay in medical treatment").   The delay between the time of Marshall's head injury and his arrival in the hospital emergency room was, at most, hours.  The record is devoid of evidence showing that this delay had any negative impact on Marshall's medical condition, or that his course of treatment would have been different had he been taken to the hospital immediately after he fell from the cot.

W.G. Supanic is entitled to summary judgment.

**D.  The Medical Treatment Claim Made Against William T. Supanic**

The claim against William T. Supanic, who executed an identical Refusal of Treatment Form on Marshall's behalf after Marshall was treated for a superficial wound on his abdomen caused by a taser probe, is also deficient.  If the claim against him were analyzed under the Fourteenth Amendment, it would fail for the same reasons discussed in the context of the claim

against William G. Supanic: the record does not establish deliberate indifference or causation. This claim against William T. Supanic, however, is different in that it is governed by the Fourth Amendment's ban on unreasonable seizures.  See Sides v. City of Champaign, 496 F.3d 820, 898 (7th Cir. 2007).

The focus of an inquiry under the Fourth Amendment is whether the officer acted reasonably under all of the the circumstances.  See Graham v. Connor, 490 U.S. 386 (1989). Here, W.T. Supanic had no reason to believe that Marshall was suffering from a serious or long-term threat to his health.  Hospital records do not show that Marshall required additional treatment for the taser wound.  In addition, the record is clear that when he was taken to the ambulance, Marshall repeatedly refused additional medical treatment, and that paramedics communicated this refusal to at least one officer on the scene.  (See Doc. 24 Ex. H at 35, 36, 38, 39, 50-51; Ex. I at 16, 17).  Paramedics did not believe that Marshall needed to go to the hospital. (Doc. 24 Ex. I at 17)

The Court concludes that no reasonable jury could find that  W. T. Supanic violated minimum constitutional standards by signing the Patient Refusal Information Sheet.  He, too, is entitled to summary judgment on the medical treatment claims.

### E.  Claims Made Against W.T. Supanic, Pecora, and Boura

#### 1.  Excessive Force

The test for evaluating a claim of excessive force is one of overall objective reasonableness judged from the perspective of a reasonable officer on the scene.  Graham, 490 U.S. at 395, 397. This test "requires careful attention to the facts of each case, including assessment of the severity of the crime alleged, the threat to the safety of officers or others, whether a suspect resists arrest, the duration of the action taken by the officer, whether the action

takes place during the course of an arrest, the likelihood that the suspect is armed, the number of persons with whom the police officer must deal at one time, and whether physical injury is alleged." See Couden v. Duffy, 446 F.3d 483, 496-97 (3d Cir. 2006).  The calculus of reasonableness includes the fact that "police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving."  Graham, 490 U.S. at 396.

Many of the facts relating to events occurring from the time that police officers were dispatched to Marshall's home and the time that he was placed in the ambulance - particularly those bearing on the factors identified in Graham are disputed. Resolution of these disputes turns largely on credibility determinations.   Based on the parties' materially different accounts of what transpired during that time period, the Court is unable to grant either of the pending Motions insofar as they pertain to this claim.[13]

## 2.  False Arrest and Malicious Prosecution

The Plaintiff has waived the right to have the Court consider these claims as he failed to raise them in his Complaint, and did not file an amended complaint  As the Court has already observed, a plaintiff may not amend his complaint via a brief.  See Commonwealth of Pa. ex. rel. Zimmerman, 836 F.2d at 181.  The reasons for this rule are obvious, and the Court does not find

---

[13] The many open questions of fact are "in tension"" with the Supreme Court's reiterated imperative in Pearson v. Callahan, 129 S.Ct. 808, 816 (2009) that the availability of qualified immunity be determined at the earliest possible point in the litigation.  See Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002).  The Court of Appeals for the Third Circuit has recognized this tension: "Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis."  Id. (citing Sharrar v. Felsing, 128 F.3d 810, 828 (3d Cir. 1997)( abrogated on other grounds by Curley v. Klem, 499 F.3d 199 (3d Cir. 2007)).  These fact questions must be submitted to a jury.  Only when the jury has completed its fact-finding can the objective overall reasonableness of an officer's actions be determined.  This reasonableness determination is reserved for the court.  Curley II, 499 F.3d at 211.

any reason to depart from it.

IV.   **Conclusion**

For the reasons set out above, the Plaintiffs Motion for Summary Judgment (Doc.26  )

will be denied.  The Motion for Summary Judgment filed by the Defendants (Doc. 22) will be

denied as to the excessive force claim made against individual Defendants Boura, Pecora, and

W.T. Supanic, and granted as to all other claims.  An appropriate Order follow.


By the Court,

/s/ *Amy Reynolds Hay*
Chief Unites States Magistrate Judge


Dated: September 30, 2009

cc:   All counsel of record by Notice of Electronic Filing