IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


GEORGE SCOTT MARSHALL,   )
        Plaintiff  )
            )
  vs.        )   Civil Action No. 08-90
            )   Magistrate Judge Francis X. Caiazza
PENN TOWNSHIP, PENNSYLVANIA, )
a political subdivision; CHIEF MICHAEL )
MASTROIANNA, an individual;  )
LIEUTENANT RALPH BOURA, an  )
individual; OFFICER WILLIAM T.  )
SUPANCIC, an individual; OFFICER  )
WILLIAM G. SUPANCIC, an individual )
and DETECTIVE SERGEANT   )
ANTHONY PECORA, an individual,  )
        Defendants )


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

CAIAZZA, United States Magistrate Judge.

  On June 28-29, 2010 the parties tried to this Court a Fourth Amendment excessive force claim brought pursuant to 42 U.S.C. § 1983.[1]  Having heard the testimony, reviewed the exhibits, and considered the parties' Proposed Findings of Fact and Conclusions of Law, (ECF Nos. 59, 60), the Court, in accordance with Fed. R. Civ. P. 52(a), issues these findings of fact and conclusions of law. [2]

**Findings of Fact**

  Trial was limited to the single claim remaining in this case after summary judgment:

---

  [1]In accordance with the provisions of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to have a United States Magistrate Judge conduct all proceedings in this matter, including the entry of final judgment. See ECF Nos. 13 and 15.

  [2]The trial transcript is filed at ECF Nos. 57 and 58. The Court references transcript pages as follows: (ECF No. ___ at ___).

whether Penn Township Police Lieutenant Ralph Boura ("Boura"), and/or Officer William T.

Supancic ("Supancic") (together "the Defendants"),[3] used excessive force in violation of the

Fourth Amendment in subduing and handcuffing George Marshall ("Marshall" or "the Plaintiff")

in the late afternoon of January 22, 2006. In making this determination, the court is responsible

for resolving factual disputes and assessing the credibility of witnesses. See Giles v. Kearney,

571 F.3d 318, 322 (3d Cir. July 15, 2009). As to the issue before it, the Court finds as follows:

Beginning the week prior to Christmas 2005 and extending well into January 2006,

Marshall, grieving the 2003 death of his son, began a period of heavy drinking and abuse of

prescription sleeping medication. (ECF No. 57 at16-17, 56). When McKowen arrived at

Marshall's home late in the afternoon of January 22, she found him unable to walk. Marshall had

ingested four or five Lunesta pills, and had consumed in the neighborhood of fifteen beers,

beginning at about 10 a.m. (Id. at 73). After Marshall fell for a third time after attempting to

stand, McKowen told him that he needed to go to the hospital.[4] She called 911, requesting an

ambulance. (Id. at 24, 73). While McKowen was on the phone with the 911 operator, Marshall

pulled himself to a standing position, wrested the phone from McKowen, and terminated the call,

stating that he did not want to go to the hospital. He again fell to the floor. (Id. at 25). When the

911 operator returned the call, McKowen explained that she had not hung up, and gave the

---

[3]The Plaintiff has abandoned any claim that Defendant Anthony Pecora violated his constitutional rights. (ECF No. 59 at 25). Thus, where reference is made to Pecora, Boura, and Supancic collectively, the Court uses the word "officers." Where reference is made only to Boura and Supancic, the Court uses the word "Defendants."

[4]McKowen had taken Marshall to the emergency room at Jeannette Hospital on January 14, 2006. (ECF No. 57 at 16). He was given IV fluids to hydrate him, and to remove alcohol from his system. He was released the same day. (Id.).

operator Marshall's address. (Id.). Marshall managed to take the phone from McKowen a second time, and fell, breaking the phone connection. The 911 operator repeatedly called Marshall's number. Each time, Marshall, who was crawling to his bedroom holding the telephone, hung up. (Id.).

In response to these events, the 911 dispatcher advised Penn Township police that an ambulance had been sent to Marshall's address. Because of the hang ups and noise in the background during the telephone calls, the dispatcher requested that police respond to what was termed a possible domestic situation. (Id. at 140). Three officers, responded in separate cars. (ECF No. 58 at 45). When the 911 dispatcher identifies a possible physical domestic dispute, Penn Township, in the interest of safety, sends every available car. (Id. at 46). Where an ambulance is also dispatched, EMTs are not allowed to approach without police clearance. The function of police is to secure the scene, making it safe for ambulance personnel. (ECF No. 57 at 135, 141; ECF No. 58 at 3, 4,5).

Supancic was one of the officers responding to the January 22 call. As he drove down Marshall's road, with Boura and Pecora following in separate cars, he saw a woman waving to them from a driveway. (ECF No.57 at 141). McKowen told the officers that Marshall was highly intoxicated, had been drinking for some time, could not stand, and needed to go to the hospital. (ECF No.57 at 26, 143; ECF No. 58 at 79). The officers asked about her condition, and she replied that she was fine. (ECF No. 57 at 143). In response to their questions, McKowen told the officers that Marshall did not have dogs, but that there were weapons in the house. (Id. at 27, 143; ECF No. 58 at 48, 86). The officers did not ask, and McKowen did not specify the type or location of the weapons. (ECF No. 57 at 27, 143). She informed the officers that she had last

3

seen Marshall crawling to his bedroom, and gave them permission to enter the home. (Id. at 26).

Per the officers' instructions, McKowen remained outside . (Id. at 28, 44).

Supancic and Pecora entered the home first, with Boura following. (Id. at 144; ECF No.

58 at 46).  The home was a small older mobile home, and the interior was dark  (ECF No. 57 at

144).  The officers shouted for Marshall.  Supancic told him that they were there to help him, and

that McKowen thought he needed an ambulance. (ECF No. 57 at 145; ECF No. 58 at 47).  When

Marshall responded vehemently that he did not want to go to the hospital, the Defendants were

able to locate him in a dark bedroom. (ECF No. 57 at 144).  Two of the officers turned on their

flashlights. (ECF No. 57 at 144, ECF No. 58 at 47).  Marshall, who missed the bed when he tried

to get in it, was lying on the floor in a narrow space between the bed and a wall. He was facing

the bed with his head about six inches from a night stand. (ECF No. 57 at 59-61, 144; ECF No.

58 at 29 47; Pl.Tr. Ex.1).

Pecora entered the bedroom first, and stood at the head of the bed, behind Marshall. (ECF

No. 58 at 47). Supancic was in the doorway slightly to the left, and Boura was behind him. (Id.).

Marshall, who was clearly highly intoxicated,  was positioned partially on his side with his right

arm beneath him, and was flailing, moving, and turning  in an attempt to stand. (Id. at 29, 80).

One of the officers tapped Marshall's  feet, telling him to get up, that they were there to help him.

(ECF No. 57 at 59, 62, 145; ECF No. 58 at 47).  Marshall told the officers that he was not doing

anything wrong, and wanted to get in bed. (ECF. No. 57 at 28, 62). Despite being ordered

repeatedly to do so, Marshall refused or was unable to show both of his hands. (ECF No. 57 at

145; ECF No. 58 at 29, 48).

In an effort to stand, Marshall reached one hand toward the bed and in the general

direction of the night stand.  (ECF No. 57 at 62, 146; ECF No.58 at 48).  Pecora attempted to

grab Marshall's hand, but nearly fell in the process.  (ECF No. 57 at 146).  Trying to prevent

Pecora from falling, Boura ordered him to release Marshall's hand.  (ECF No. 58 at 48). While

Marshall was still reaching, Boura ordered Supancic to use the Taser.  (Id. at 50).[5]  Supancic,

who had never deployed a Taser in the line of duty,  pulled the Taser from its holster, aimed it at

Marshall's torso, pulled the trigger, and saw the probes deploy. (ECF No. 57 at 146; ECF No.58

at 21). The probes struck Marshall in "the lower left stomach area and his left thigh area." (Def.

Tr. Ex. C at 3).  Marshall felt a sensation "like getting electrocuted" that lasted "a couple of

seconds."(ECF No. 57 at 64).  For a split second, Marshall stopped moving, but then resumed

flailing and reaching.  (Id. at 147). One of the officers said, "Get the motherfucker again." (Id. at

64).  Almost immediately after pulling the Taser trigger the first time, Supancic, thinking that the

Taser had not worked, "instinctively"pulled the trigger again.  (Id. at 147).  Neither the probes

nor the Taser contacts touched Marshall as a result of this second pull of the trigger. Boura

"could see that "the bottom probe had  fallen out," (ECF No. 58 at 73), and said, "[The Taser]

didn't work, it didn't work, just grab him." (Id.).

      Supancic then took one of Marshall's feet, Boura took the other, and Pecora took his

---

[5]Penn Township Chief of Police, Michael Mastroianni testified that the Penn Township Police
Department began using Tasers on November 1, 2005, and had three Tasers in January 2006. (ECF No. 57
at 117).  At that time, the Department had policies regarding use of force, and Taser use in particular.
Boura, Pecora, and Supancic had undergone use of force training and, in October 2005, completed Taser
use training. (Id. at 112-124).  A Taser was carried by the police officer 'working the road" on a given
shift. (Id. at 139).  Mastroianni explained that a Taser cartridge contains probes that can be deployed once
in order to interrupt electromuscular reflexes, and that a cartridge cannot be used more than once.  In order
for the Taser to be reloaded, the used cartridge must be removed, and a new cartridge installed.  The taser,
may, however, also be used without the probes.  When the contacts are placed directly against the body,
the Taser may be used as a stun gun. Used in this way, in the drive stun mode, the Taser causes pain, but
there is no neuromuscular disruption. (Id. at 120).

shoulders. (Id. at 147-48). The three carried Marshall into the living room. There, the officers

paused and attempted to, but could not handcuff the Plaintiff. (ECF No. 57 at 148; ECF No.58 at

25, 51). Supancic placed the Taser against Marshall's body, and activated it in drive stun mode

in order to secure Marshall's compliance. (ECF No. 58 at 25). The Taser did not give Supancic

"the effect" he wanted, and Marshall continued to struggle. (Id.). The officers again picked

Marshall up, carried him into the yard, and put him down on his back. (ECF No. 57 at 148).

While he was being carried, he was not struggling. (Id. at 30). Supancic stated that about forty-

five seconds elapsed from the time that the officers entered Marshall's bedroom and the time that

he was carried into the yard. (Id. at 153). In light of McKowen's credible testimony, however,

the Court finds that the time elapsed should be counted in minutes - albeit very few minutes -

rather than seconds.[6]

Once Marshall was on the ground outside, Pecora and Supancic rolled him to his stomach

with his right arm pinned underneath his body. Marshall continued to flail. (ECF No. 58 at 52).

At that point, Pecora was able to lock Marshall's left hand behind his back in preparation for

cuffing. (Id.). The officers believed that cuffing Marshall was essential to ensuring the safety of

the EMTs as they attempted to assess him. (Id. at 3). Supancic was on Marshall's right side,

trying to free Marshall's right arm from under his body so that he could be cuffed. (Id.; ECF No.

---

[6]McKowen testified that after she gave the officers permission to enter Marshall's home, she was asked to and did wait outside. A couple of moments later, she entered the trailer to see what was happening. (ECF No. 57 at 28). She observed one of the officers kicking Marshall's foot, and heard Marshall saying that he was trying to get in bed. (Id.). She also heard one of the officers yell, "Get him," and "Haven't you had enough yet, you MF'er." (Id.). McKowen asked the officers what they were doing, and told them not to hurt Marshall. (Id. at 29). One of them replied that no one was hurting Marshall, and ordered her to go back outside. She did so, and remained in the yard "for a couple of minutes" before returning to the trailer. Again inside, she observed the officers carrying Marshall through the living room to the outside. (Id.). McKowen did not witness any application of the Taser inside Marshall's home, and did not see the officers' interaction with Marshall in the yard prior to the handcuffing. (Id. at 45).

58 at 62).  He was unsuccessful.  (Id.).  Boura then took the Taser, removed the cartridge, and told

Marshall that if he did not present his right arm he would be tasered. (ECF No. 58 at 52).  When

Marshall failed to comply, Boura "gave him a real quick" application of the Taser in drive stun

mode. (Id.).  When Marshall's arm did not come free, Boura again used the Taser, for about a

second, in drive stun mode.  (Id.).  After Boura's second application of the Taser, Marshall's

"arm did pop out," and Supancic and Pecora were  able to handcuff him.  (Id.).  At that point,

Boura considered Marshall to be under arrest. (Id. at 70).

Marshall was assisted to a sitting position and frisked for weapons. Boura then

summoned the ambulance crew to Marshall's yard. (Id. at 53). [7]  The EMTs assessed Marshall,

noting what appeared to be old bruising on his torso. (Id.). Once Marshall was in the ambulance,

a taser probe was removed from the upper left quadrant of his stomach. (ECF No.58 at 39). No

additional medical treatment was required, and Marshall stated repeatedly that he did not want to

be taken to the hospital.  (Id. at 34,58). At that point, Supancic concluded that Marshall was

under arrest. (Id. at 70-71).  At the Defendants' request, the ambulance crew transported Marshall

to the Penn Township Police Station, (ECF No. 57 at 33), where he was placed in a cell visible

via video monitor and through one way glass.  (Id. at 131). In addition, officers checked Marshall

in person at least once every thirty minutes. (Id.).

A motion-activated video recording made over the two hour period that Marshall spent  in

the cell establishes that for all but fifteen to twenty minutes Marshall was immobile. (ECF No. 58

---

[7]While Marshall was being tended to by EMTs, Pecora went back into the trailer.  In the drawer he
located a 12 inch bayonet knife in the drawer of the night stand, and found a fully loaded military style rifle
leaning against the bedroom closet door. (ECF No.58 at 83; Def. Tr. Ex. C at 3).  These weapons were
seized and inventoried.

at 40). This extremely disturbing video shows Marshall's attempts to stand and move toward the

cell's toilet. In that process, he suffered a number of uncontrolled falls, appearing to strike

different parts of his body on the wall, floor and toilet. (Id. at 115-56; Def. Tr. Ex. G). [8] The

movements depicted in the video were similar to those made by Marshall when he was on his

bedroom floor in the presence of the officers. (ECF No. 58 at10, 40). When Boura saw Marshall

fall - an observation that, astoundingly, he made only once - and "staggering around," he went

back to the cell and told Marshall to lie down. (Id. at 58). Marshall listened "immediately." (

ECF No. 57 at 156, ECF No 58 at 58). While he was in the cell, Marshall suffered fall-related

lacerations above his eye and on his elbow. (ECF No. 57 at 89). When Boura was apprised of

the injury by another officer, Supancic's father, William G. Supancic, that Marshall had been

injured, Boura summoned EMTs who cleaned and bandaged the wound on Marshall's forehead.

(Id. at 157). The EMTs again were unable to convince Marshall to go to the hospital, and left the

Jail. (ECF No. 57 at 58; ECF No. 58 at 58).

Following video arraignment in the jail's processing room on charges of disorderly

conduct and resisting arrest, Marshall was returned to the cell. When it was clear that he would

be unable to post bail, he was put into a police car and transported to the Westmoreland County

Jail. (ECF No. 57 at 159). At the Jail, guards observed the bandage on the Plaintiff's forehead,

and summoned a staff nurse. (Id. at 170). The nurse determined that he could not be admitted to

the Jail until he had been evaluated at Westmoreland Hospital. (Id.). Refusals of this type were

not unusual, given that Jail policy prohibited staff from processing intoxicated or injured

---

[8] Because the Plaintiff failed to assert a Fourth or Eighth Amendment claim based on conditions of
confinement, what transpired during his detention is relevant to the Court's analysis only insofar as it
relates to the cause of injuries observed when Marshall was taken to the emergency room.

individuals absent medical clearance. (Id. at 127). Marshall was transported in a police car to the

emergency room where he was treated and admitted. (Id. at 170). There is no evidence to

establish that Marshall's admission to the hospital and his subsequent stay had anything to do

with injuries inflicted by the Defendants, or with events that occurred during his arrest.

When McKowen saw Marshall the next day, he was shackled to a bed, and had bruises on

both arms from his wrists to the area of his shirt sleeves, and stitches above his left eye and in his

elbow. (Id. at 37-38). Marshall did not have these injuries when McKowen last saw him at the

trailer on January 22, (id. at 38, 46), and Marshall does not know how he sustained them. (Id. at

88-89). Marshall remained in Westmoreland Hospital for fourteen days, and was then transferred

to a skilled therapy rehabilitation facility were he spent five days. (Id.). The misdemeanor

disorderly conduct charge against him was withdrawn prior to a preliminary hearing, and,

following a jury trial in state court, Marshall was acquitted on charges of resisting arrest. (ECF

No. 58 at 9-10).

## Conclusions of Law

### The Excessive Force Determination

To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of

state law deprived him of a federal right. 42 U.S.C. § 1983.[9] There is no question that the

---

[9]This section reads in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State or Territory or the District of Columbia, subjects, or causes to
be subjected, any citizen of the United States or other person within the
jurisdiction thereof to the deprivation of any rights, privileges, or immunities
secured by the Constitution and laws, shall be liable to the party injured in an
action at law, suit in equity, or other proper proceeding for redress . . . .

Defendants were acting under color of state law in their official capacities as Penn Township

police officers at the time of their interaction with Marshall. It is also undisputed that the use of

excessive force in the course of an arrest was, at the time, constitutionally prohibited. Thus, the

single question to be resolved is whether the taserings administered by Supancic and/or Boura

transgressed Marshall's rights under the Fourth Amendment of the United States Constitution. [10]

Marshall bears the burden of proving his claim by a preponderance of the evidence. See, e.g.,

Groman v. Twp. of Manalapan, 47 F.3d 628, 638 (3d Cir.1995).

The law recognizes that arresting officers have "the right to use some degree of physical

coercion ." Graham v. Connor, 490 U.S. 386, 396 (1989). The test for evaluating a claim of

*excessive* force is one of overall objective reasonableness judged from the perspective of a

reasonable officer on the scene. Id. at 395, 397. This test requires careful attention to the facts of

each case, including assessment of the severity of the crime alleged, the threat to the safety of

officers or others, whether a suspect resists arrest, the duration of the action taken by the officer,

whether the action takes place during the course of an arrest, the likelihood that the suspect is

armed, the number of persons with whom the police officer must deal at one time, and whether

physical injury is alleged. Couden v. Duffy, 446 F.3d 483, 496-97 (3d Cir. 2006) (citing Carswell

v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2006); Sharrar v. Felsing, 128 F.3d 810,

822 (3d Cir. 1997)). The Court's task is to determine whether an officer's actions were

"'objectively reasonable' in light of the facts and circumstances confronting [him] without regard

to [his] underlying intent or motivation." Graham, 490 U.S. at 397.

---

[10]"[A]ll claims that law enforcement officers have used excessive force ... in the course of an
arrest, investigatory stop, or other 'seizure' of a free citizen [are] analyzed under the Fourth Amendment."
Graham v. Connor, 490 U.S. 386, 395 (1989).

The calculus of reasonableness includes the fact that "police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving." Id. at 396. The Court of Appeals for the Sixth Circuit has emphasized the importance of viewing events as they transpired, admonishing that "[w]e must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that [police officers] face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992). "Methods employed by law enforcement that may seem extreme in hindsight are not per se constitutional violations, even if they caused discomfort to a plaintiff." Wargo v. Municipality of Monroeville, PA, 646 F. Supp. 2d 777, 784-5 (W.D. Pa. 2009) (citing Graham, 490 U.S. at 396; Sharrar, 128 F.3d at 821).

Thus, this Court must balance Marshall's interest in freedom from the application of force against the police officers' interest in protecting the Plaintiff, themselves, and medical personnel responding to the call for assistance. The Defendants' position is that the force used against Marshall was reasonable, given that he resisted their efforts to aid him, creating a situation that reasonably caused them to fear for the safety of everyone at the scene.

The Court agrees, and is confident that Boura's ordering and Supancic's use of the Taser inside Marshall's home did not transgress the requirements of the Fourth Amendment. The Defendants do not dispute that when they entered Marshall's home, they understood that although they were responding to a possible physical domestic situation, McKowen had called 911 due to what she believed to be a medical emergency. They also knew that Marshall was extremely intoxicated, had abused prescription sleeping medication, and that McKowen could

11

not take him to the hospital herself, because he could not stand or walk. Marshall, though

impaired, was twice able to take the phone from McKowen during her call to 911. The officers

had been told that there were weapons in the trailer, and it became immediately apparent that

Marshall did not want medical attention.

When Marshall, who was struggling to stand in an unlit narrow space between the bed

and a wall, would not or could not show both hands, and reached with his free hand across his

body toward the bed and in the direction of the night stand, the Defendants had reasonable

grounds to fear for their own safety.[11] The Court finds that Boura's order to deploy the Taser,

and Supancic's prompt compliance were reasonable responses to a potentially threatening

situation.

The Court similarly finds that the second tasering in Marshall's living room, which

occurred mere seconds after the officers were able to grab Marshall's legs and upper body, was

also a reasonable response to ongoing and uncertain circumstances. During a brief stop in the

still-dark living room, the Defendants put Marshall, who continued to struggle, on the floor in an

attempt to handcuff him. Supancic admits that he applied the Taser directly to Marshall's body,

using the instrument in drive stun or pain compliance mode, again to no apparent effect. Marshall

does not remember this tasering. The officers again managed to lift Marshall, and carry him by

---

[11]Marshall testified that his thrashing did not amount to resistance, but was instead incident to his attempt to stand. Indeed, the video documenting Marshall's movement while he was detained seems to confirm his testimony. The Defendants have stated that Marshall's movements as seen in the video are similar to the ones observed during the incident at Marshall's home. What now seems clear may well not have been clear to the officers on the scene. Officers viewing Marshall's flailing prior to being handcuffed may reasonably have interpreted his movements as aggressive behavior or a refusal to cooperate. See e.g., Armbruster v. Marguccio, Civ. No. 05-3443, 2006 WL 3488969 at * 6 (W.D. Pa. Dec. 4, 2006) (finding that plaintiff's involuntary movements could reasonably have been interpreted as requiring use of force).

the feet and shoulders into the yard. Marshall was placed on his back. When he was rolled onto

his stomach, Marshall's right arm became trapped underneath his body requiring two short burst

of the Taser in order to free it.

The Court must now address whether these last applications of the Taser were excessive

standing alone, or rendered the overall use of force excessive. It does so in terms of the factors

outlined in Graham. As to the first factor, the severity of the crime, there was no crime.

McKowen had called 911 because she was concerned for Marshall's physical welfare. The

police responded to this call in a community caretaking capacity - to ensure that personnel called

to address what McKowen described as a medical emergency could safely enter the scene to

evaluate Marshall.[12] The absence of criminal conduct does not preclude the use of force; it is one

"relevant factor to be considered as part of the totality." Sharrar, 128 F.3d at 823.

The Court cannot ignore the fact that at the time of the third and fourth taserings,

Marshall was face down on the ground with his left arm locked behind him. The undeniably

tense atmosphere which existed inside the trailer had dissipated, at least to some degree.

Nonetheless, the time frame in which all of the relevant events occurred was brief. Had Marshall

not been handcuffed immediately, he may yet have been in a position to injure himself, the

officers, or medical personnel. His physicality, whether or not it was intended to injure, could

also have hindered or prevented medical assessment. It is apparent that the officers, at the time of

the third and fourth taserings, believed that there was some continued possibility that Marshall

---

[12] The "community caretaking" aspect of police responsibilities is well documented in case law.
See e.g., Stanley v. City of Baytown, Texas, Civ. A. H-04-2106, 2005 WL 2757370 at * 4-5 ( S.D. Texas
Oct. 25, 2005) (describing community caretaking function as including "stopping or seizing a citizen for
his own safety and /or the safety of others, regardless of the officers' suspicion of criminal activity or lack
thereof").

was armed, given that after he was cuffed and assisted to a sitting position, he was frisked for weapons. Only after this pat-down were medical personnel allowed to approach.

The Court has considered the Plaintiff's position that Boura's use of the Taser was not necessary to effect the handcuffing, and that three officers - who were visibly larger and heavier than Marshall - should have been able to extricate Marshall's arm without it. The argument has some merit in the light of hindsight. The Court notes that there is no question that in the courtroom Marshall projected a calm, reasonable demeanor, and his testimony that he did not intend to hurt anyone at the scene was believable. He, like McKowen, did not exaggerate the events at issue, and was a compelling witness. Nonetheless, the Court cannot find that Boura's use of the Taser in Marshall's yard was prohibited in the circumstances existing on January 2, 2006. What may seem unnecessary in the quiet and relative civility of trial could well have seemed reasonable in the context of events unfolding on the night in question.

This conclusion that the overall force used by Supancic and Boura was not excessive is supported by the fact that Marshall failed to establish any lasting injury resulting from the Defendants' conduct. In saying this, the Court does not ignore or trivialize Marshall's testimony that he suffered pain when the Taser was deployed, or that he thinks frequently about and resents its use. Though the Court credits this testimony, the evidence at trial showed that the pain was brief. When Marshall was tasered first in his bedroom, the neuromuscular effect was interrupted almost immediately, because one of the probes did not attach firmly. Marshall does not even remember the tasering in his living room. Last, the two bursts from the Taser in the front yard were administered while the instrument was in drive stun mode, and lasted about one second each. It is not surprising, therefore, that Marshall did not introduce evidence - aside from the

14

removal of one Taser probe by ambulance personnel - that he received or sought treatment for Taser-related injuries or aftereffects.[13]

Having reviewed the trial record at trial against the background of the factors relevant to a Fourth Amendment excessive force determination, the Court finds that the Defendants' overall use of force was not excessive. It follows, therefore that the Plaintiff has failed to establish a violation of his rights under the Fourth Amendment.

**Availability of Qualified Immunity**

Notwithstanding the Court's conclusion that the forced used by the Defendants did not violate Marshall's Fourth Amendment rights, it finds, in the interest of full discussion, that even had their conduct transgressed the Fourth Amendment, the Defendants would be entitled to qualified immunity.[14]

The doctrine of qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The doctrine protects all but the "plainly incompetent or those who knowingly violate the law," Hubbard v. Taylor, 538 F.3d

---

[13]The Court is, of course, aware that the lack of serious physical injury is not, in itself, dispositive of a Fourth Amendment excessive force claim. See Schall v. Vazquez, 322 F. Supp.2d 594, 603 (E.D. Pa. 2004) (citing Hector v. Watt, 235 F.3d 154, 157 (3d Cir. 2000) (holding that victims of Fourth Amendment violation may be entitled to different categories of damages including property damage, injury to reputation, etc.)).

[14]Marshall ignores the issue of qualified immunity in his Proposed Findings of Fact and Conclusions of Law.

229, 236 (3d Cir. 2008), and, in Fourth Amendment cases challenging police use of force, insulates officers "from the sometimes hazy border between excessive and acceptable force." Saucier v. Katz, 533 U.S. 194, 205 (2001) (receded from on other grounds in Pearson v. Callahan, ___U.S.___, 129 S.Ct. 808 (2009)).

In determining whether qualified immunity is available to a defendant, the Court must consider two questions in the light most favorable to the Plaintiff: 1) whether "the plaintiff has alleged a deprivation of a constitutional right;" and 2) whether that right was "clearly established" at the time of the Defendants' alleged misconduct. Pearson 129 S.Ct. at 816. These questions may be answered in either order. Id. at 818. Finally, even if the Court concludes that a clearly established constitutional right was violated, "[i]f an official could have reasonably believed that his or her actions were lawful, the official receives qualified immunity." Forbes v. Twp. of Lower Merion, 313 F.3d 144, 148 (3d Cir. 2002). See also Carswell, 381 F.2d at 242. The burden of establishing entitlement to qualified immunity belongs to the Defendants. See Harlow, 457 U.S. at 808; Reedy v. Evanson, ___F.3d___, No. 09-2210, 2010 WL 2991378 at * 18 (3d Cir. Aug. 2, 2010).

For purposes of the qualified immunity analysis the Court assumes, arguendo, that Marshall has established a violation of his Fourth Amendment rights. Therefore, it turns directly to the second analytical prong - whether that right was clearly established. A right is clearly established where " '[t]he contours of [that] right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Saucier, 533 U.S. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640, (1987)). It is undisputed that the overarching right to be free from excessive force was clearly established at the time of the Defendants' interaction

with Marshall.  The general definition of a right, though, is not sufficient to resolve the question

of qualified immunity. As the Court of Appeals for the Eleventh Circuit has observed, "[F]or the

law to be clearly established to the point that qualified immunity does not apply, the law must

have earlier been developed in such a concrete and factually defined context to make it obvious

to all reasonable government actors in the defendants' place, that what he is doing violates

federal law." Jenkins v. Talladega City Bd. of Educ., 115 F.3d 821, 823 (11th Cir.1997) (en

banc) (citing Anderson, 483 U.S. at  640)). Thus, "the contours of the right must be viewed in the

light of the circumstances confronting [the] particular defendant." Sanders v. City of Fresno,  551

F.Supp.2d 1149, 1171 (E.D. Cal. 2008) (citing Saucier, 533 U.S. at 201) (other citations

omitted)).

"[T]he application of a taser may be a reasonable use of force." Owens v. Fox, No. 07-

365-JJF, 2010 WL 1408920 at *8 (D.Del. March 30, 2010) (citing Zivojinovich v. Barner, 525 F.

3d 1059, 1071-73 (11th  Cir. 2008)).  The case law addressing Taser use, is, however, highly fact

dependant. In January 2006, the Supreme Court had not considered -  and no court in the Third

Circuit or in Pennsylvania had addressed -  the constitutionality of using a Taser or stun gun in

circumstances analogous to those existing  here.[15]  Even taking into account the many excessive

---

[15]Courts outside the Third Circuit had held that "the gratuitous use of force on a suspect who has
already been subdued and placed in handcuffs is unconstitutional." Bulmeta v. Benzie County, 2005 WL
1993429 at * 6 (6th Cir. August 17, 2005) (citing Champion v. Outlook Nashville, Inc., 380 F.3d 893,
900-01 (6th Cir. 2004) (finding it "excessive for police officers to lay on top of a mentally retarded
individual who had stopped resisting arrest and posed no flight risk, and spray him with pepper spray even
after he was immobilized by handcuffs and a hobbling device")) The circumstances in those cases were,
significantly more egregious that those here.
    There was also case law, based on facts arguably similar to those here, finding that Taser use was
not excessive.  See Stanley v. City of Baytown, Texas, Civ.A.No. H-04-2106, 2005 WL 2757370 at * 4-5
(S.D. Texas Oct. 25, 2005) (holding that EMTs' call for police assistance coupled with situation confronted
by reporting officers - namely, muscular, sweaty and uncontrollable patient resisting efforts of EMTs and
firemen to restrain him and resisting pleas to calm down -  provided basis for officer's belief that plaintiff

force cases adjudicated since, the law still does not establish that use of a Taser or comparable

force is prohibited where a police officer, attempting to secure a scene for medical personnel

following a report of potential physical domestic abuse, encounters a noncompliant and

apparently resisting subject who reasonably appeared to pose a threat to himself, police officers,

or to EMTs seeking to render aid.

This more recent authority, in fact, suggests the opposite. See e.g., Brown v. Rinehart,

No. 08-4124, 2009 WL 1154244 at * 3 (3d Cir. April 16, 2008) (finding officer's delivery of stun

blow to unarmed plaintiff's thigh not excessive where plaintiff, who appeared to be intoxicated,

resisted verbal warnings, and placed hands underneath his body to prevent handcuffing); McNeil

v. City of Easton, 694 F.Supp.2d 375, 393 (stating: "[e]ven if a plaintiff is not armed, it is

reasonable for law enforcement officers to employ multiple rounds of non-lethal force if

necessary to effectuate an arrest") (citing Wargo v. Municipality of Monroeville, 646 F. Supp.2d

777, 786 (W.D. Pa. 2009)); Gruver v. Borough of Carlisle, No. 4:CV 05-1206, 2006 WL

1410816 at * 5 (M.D. Pa. May 19, 2006) (holding that police officers attempting to restrain

unarmed plaintiff who appeared to be intoxicated or in distress did not use excessive force when,

in order to protect plaintiff, themselves, and others, they deployed Taser three times).

Given the state of the law at the time of the incident, the Court finds that it would not

have been clear to the Defendants that they violated the Fourth Amendment by using the Taser in

the factual scenario described at trial. Thus, both Supancic and Boura are entitled to qualified

---

posed danger to himself and others, justifying use of Taser).

immunity. <u>See</u> <u>Saucier</u>, 533 U.S. at 202 . The Court is further persuaded that even if the Defendants' actions could be found to have violated established law, their mistake regarding what the law permitted was reasonable in light of the circumstances they faced. On this ground, too, Boura and Supancic would be entitled to qualified immunity. <u>See</u> <u>Brousseau v. Haugen</u>, 543 U.S, 194, 198 (2004) (qualified immunity protects an officer who makes a constitutionally deficient decision based on reasonable misapprehension of the law); <u>Hall v. Raech</u>, 677 F. Supp.2d 784 (E.D. Pa. 2010) (reiterating that qualified immunity protects officers who make reasonable mistakes as to what the law requires.)

For the foregoing reasons, Judgment will be entered against the Plaintiff and on behalf of the Defendants. An appropriate Order follows.

September 28, 2010

BY THE COURT:

/s/ *Francis X. Caiazza*
Unites States Magistrate Judge

cc:     Counsel of Record via CM-ECF